KAREN P. HEWITT
United States Attorney
ALESSANDRA P. SERANO
Assistant U.S. Attorney
California Bar No. 204796
BRUCE C. SMITH
Assistant U.S. Attorney
California Bar No. 078225
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7084/6963

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08CR0803-H |
|---|---|---|
| Plaintiff, | ) | DATE: September 2, 2008 |
| | ) | TIME: 2:00 p.m. |
| v. | ) | |
| | ) | STATEMENT OF FACTS AND |
| RAUL GUTIERREZ-VILLALOBOS, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| Defendant. | ) | GOVERNMENT'S MOTIONS |
| | ) | IN LIMINE TO: |

(1) ADMIT EXPERT TESTIMONY;
(2) PROHIBIT SELF-SERVING HEARSAY;
(3) PROHIBIT REFERENCE TO DEFENDANT'S HEALTH, FINANCES, EDUCATION, AND POTENTIAL PUNISHMENT;
(4) ADMIT DEMEANOR EVIDENCE;
(5) LIMIT CHARACTER EVIDENCE;
(6) PRECLUDE ALL WITNESSES EXCEPT CASE AGENT;
(7) PRECLUDE EVIDENCE OF DURESS AND NECESSITY;
(8) PRECLUDE DEFENSE EXPERT WITNESS;
(9) RENEWED MOTION FOR RECIPROCAL DISCOVERY

(10) ADMIT "BLIND MULE" TESTIMONY

//

//

# I

## STATEMENT OF THE CASE

On March 19, 2008, a federal grand jury in the Southern District of California returned a single count indictment charging Defendant Raul Gutierrez-Villalobos ("Defendant") knowingly and intentionally possessing, with the intent to distribute approximately 1,823.43 kilograms (4,019.9 pounds) of marijuana, a Schedule I controlled substance in violation of Title 21, United States Code, § 841(a)(1).

Motions in limine are scheduled for September 2, 2008.

# II

## STATEMENT OF FACTS

### A. The Offense

On Tuesday, February 19, 2008, at approximately 10:30 p.m., Defendant arrived at the United States Border Patrol (hereinafter referred to as "USBP") Highway 111 checkpoint near Niland, California, as the driver and sole occupant of a green 1999 Kenworth tractor with trailer bearing California license plates. Both the tractor and trailer were registered to Gerardo Beltran (hereinafter referred to as "Beltran") of G & A Beltran Trucking, Heber, California. Gutierrez-Villalobos said he worked as a driver for Beltran.

As Defendant pulled the tractor-trailer to a stop at the primary inspection position, he was greeted by USBP Agent Zepeda. In response to the agent's inquiry, Defendant identified himself as a citizen of Mexico, and described his cargo as a load of candles. Agent Zepeda specifically asked Defendant if he had a customs seal on the trailer. Defendant assured him he did. Agent Zepeda asked to examine the documentation for the cargo he was hauling. Defendant appeared anxious as he frantically searched for the requested documents first in the cab, then back in the sleeper. Agent Zepeda thought this behavior was odd because, in his experience, most professional truck drivers keep their manifest and cargo documents in a convenient spot, and at the ready for the frequent inspections they encounter. It was especially curious to watch a driver searching for such documents in the sleeper section of the tractor. Agent Zepeda noted Defendant searched the bedding material and even looked under the mattress, all without success. Defendant simply could not produce the requested paperwork. At that point, Defendant and his truck were referred to the secondary inspection area for a more thorough evaluation.

In secondary, Defendant advised Agent Zepeda he had no written documentation relative to the cargo aboard the trailer. Agent Zepeda asked Defendant for consent to search the truck and trailer with his USBP service canine. Defendant agreed. The agent's dog, "Tosca" was led around the tractor and trailer rig. Tosca alerted to the rear of the trailer, and to the forward area of the trailer near the refrigeration unit. Based on his training and experience with Tosca, the dog's behavior indicated it detected the odor of illegal drugs inside the trailer. Tosca was returned to the agent's service vehicle, and Zepeda continued his examination of the tractor and trailer.

Agent Zepeda inspected the rear cargo doors of the trailer and noted the locking mechanism was secured, and United States Customs and Border Protection (hereinafter referred to as "CBP") bolt seal number "A967172" was in place.

Agent Zepeda opened the rear trailer doors. As the doors yawned open, he observed hundreds of bundles wrapped in brown plastic. Inside the trailer, Agent Zepeda found no candles, and no other cargo, just hundreds of tape-wrapped bundles. Agent Zepeda selected a bundle at random and gave it a closer examination. The outside of the package was covered in brown plastic packing tape. Layers of plastic wrap underneath were coated in a greasy substance. Cutting into the package, he discovered the contents to be a green plant material. Based on his training and experience, Agent Zepeda suspected the bundle contained marijuana. A morsel of the contents was extracted and subjected to a USBP presumptive drug test device. The sample yielded a result confirming Agent Zepeda's suspicions. The bundle contained marijuana.

Also discovered inside the trailer was a roll of green tape bearing the pre-printed message, "Examined By U.S. Customs."

At approximately 11:05 p.m., USBP agents at the check point contacted the Drug Enforcement Administration (hereinafter referred to as "DEA"). They reported the massive marijuana seizure, and asked that agents be summoned to continue the investigation.

The cargo of the trailer was inventoried. It contained a total of 332 bundles, with a combined weight of 1,823.43 kilograms, approximately 4,019.9 pounds.

The USBP agents contacted CBP personnel with access to TECS computer records. A nationwide 72-hour port of entry lane check was conducted. It was determined that the truck and trailer

1  rig last entered the United States at the Calexico East Port of Entry, in Calexico, California. The rig,
2  driven by Defendant, entered from Mexico on February 19, 2008, at 4:30 p.m., almost exactly 6 hours
3  prior to his arrival at the USBP Highway 111 check point near Niland.
4      At approximately 2:40 a.m., DEA Agents Ortiz and Dockery, along with Task Force Officer
5  (hereinafter referred to as "TFO") Tabarez, arrived at the USBP checkpoint. After the DEA agents were
6  briefed on the status of the investigation, they introduced themselves to Defendant.

**B.    Defendant's Statement**

Approximately 5 hours after Defendant arrived at the USBP checkpoint, at 3:32 a.m., he was advised of his Miranda rights in Spanish by TFO Tabarez in the presence of DEA Agents Ortiz and Dockery. Defendant acknowledged those rights, waived them, and agreed to participate in an interview.

Defendant stated that earlier that day, at around 4:00 p.m., he drove the tractor and trailer rig from Mexico into the United States through the Calexico East Port of Entry at Calexico, California. At that time, the trailer was empty. A check with CBP TECS records confirmed the truck and trailer crossed into the United States at 4:30 p.m. During that crossing, the trailer was subjected to a routine inspection and X-ray evaluation by CBP officers on duty. A CBP seal was not affixed to the trailer rear cargo doors at that crossing.

By way of background, Defendant explained he was hired by the owner of the truck and trailer, Gerardo Beltran, to cross the tractor and empty trailer. After crossing, Defendant was to leave the tractor and trailer rig at an undisclosed location in Calexico, California. After crossing through the port of entry, Defendant drove his employer's rig to the USA Mart on State Highway 7. While there, Defendant encountered a person known to him as "Pilo." During their conversation, "Pilo" offered to pay defendant $600.00 to transport a load of candles north to Vernon, California. Defendant agreed to the proposal.

"Pilo" stated he would go fetch the cargo of candles. Defendant permitted "Pilo" to take custody of his employer's tractor and trailer rig. Meanwhile, Defendant waited for the return of "Pilo" and his employer's equipment at the USA Mart. After approximately 40 minutes, "Pilo" returned with the truck. Defendant noted the rear cargo doors of the trailer were secured with the CBP bolt seal. Defendant

1  harbored doubt as to the true nature of the cargo. He questioned "Pilo" about the cargo, and warned him
2  the trailer better be filled with candles, not undocumented aliens.
3      With "Pilo" in the passenger seat, Defendant took over the role of driver, and the duo began their
4  voyage north to Vernon. Near Brawley, California, they stopped at an AM/PM Mini Mart for coffee.
5  Before continuing on, "Pilo" announced his plans had changed. He would get a ride from his girlfriend
6  to the 29 Palms Casino. He directed Defendant to stop at the casino on his way to Vernon. "Pilo" would
7  rejoin Defendant at that point, and continue on to Vernon and the delivery site.
8      Throughout the interview, Defendant insisted he had no idea the trailer contained any type of
9  contraband. Defendant also fidgeted and could not sit still during the entire interview.
10     Agent also learned that Defendant had an incomplete log book and an expired Mexican driver's
11 license.
12     **C.     Tractor & Trailer Owner's Statement**
13     On February 21, 2008, DEA Agents Ortiz, Dockery, and TFO Sawyer interviewed Gerardo
14 Beltran at the DEA Imperial County District office. He is the owner of the tractor and trailer
15 transporting the marijuana cargo driven by Defendant on February 19, 2008. The agents explained that
16 the United States government had initiated administrative forfeiture proceedings against Beltran's tractor
17 and trailer. When encountered at the USBP checkpoint, the tractor and trailer rig was being used as a
18 conveyance to transport over 4,000 pounds of marijuana. As such, it was subject to forfeiture.
19     Beltran confirmed that Defendant had worked for his trucking company as a driver. Beltran had
20 contracted to accept a trailer load of cartons of produce from the H&K Cooler facility on the morning
21 of February 20, 2008, and transport the cargo to a specified destination in Mexicali, Mexico. On
22 February 19, 2008, Beltran directed Defendant to cross the tractor and empty trailer rig from Mexicali
23 to the United States. The Defendant was instructed to drive directly from the port of entry to the H&K
24 Cooler in Brawley, California, pick up the cargo at the cooler, and deliver it to Mexicali.
25     Beltran recalled receiving a telephone call from Defendant at around 7:00 p.m. on February 19,
26 2008, about 3 hours before Defendant arrived at the USBP Highway 111 checkpoint in Niland.
27 Defendant told Beltran he was going to spend the night in Brawley. Defendant made no mention about
28 using Beltran's tractor and trailer rig for any other purpose. Defendant did not have permission to

5

embark on any type of side trips or adventures. The next call Beltran received from Defendant was on February 20, 2008, at 7:12 a.m. Defendant reported he was stopped at a USBP checkpoint and drugs were found in the trailer. Defendant explained the trouble at the checkpoint was the result of him taking a simple delivery job to Los Angeles.

## III

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.   The Court Should Admit Expert Testimony Regarding the Identity, Wholesale and Retail Value, and the Distributable Quantity of the Drugs at Issue**

If specialized knowledge will assist the trier-of-fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed.R.Evid. 702. The trial court has broad discretion to admit such expert testimony. See, e.g., United States v. Alonso, 48 F.3d 1536, 1539-40 (9th Cir. 1995). An expert may base his or her opinion on hearsay or facts not in evidence where the facts or data relied upon are of the type reasonably relied upon by experts in the field. See Fed.R.Evid. 703. In addition, an expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier-of-fact. See Fed.R.Evid. 704.

### 1.   Identity of Substance as Marijuana

The Government intends on calling a DEA forensic chemist to testify as to the identity of the substance seized from the vehicle in this case. The Government expects him to testify that laboratory examinations confirmed that the contraband was marijuana, a Schedule I Controlled Substance. This testimony bears directly on an element of the charged offense: that marijuana is a prohibited drug.

This testimony is permitted under Rule 702 of the Federal Rules of Evidence, which allows witnesses qualified as experts to testify as to scientific or technical knowledge that "will assist the trier of fact to understand the evidence." See United States v. Cruz, 127 F.3d 791, 801 (9th Cir. 1997) (DEA forensic chemist properly established as expert to identify nature of controlled substance); United States v. Burden, 497 F.2d 385, 387 (8th Cir. 1974) (forensic DEA chemist, whose educational background and experience were established, was properly allowed to testify as an expert on the various tests performed on a substance to confirm that it was marijuana).

### 2. **Wholesale and Retail Value of the Marijuana**

The Government also intends to present expert testimony from a DEA Special Agent regarding the wholesale value and street value of the marijuana seized in this case. The assigned Special Agent has continuous contact with state and federal intelligence programs, contact with narcotics agents at the state and federal levels, contact with undercover agents who have worked closely with drug-traffickers, contact with cooperating defendants who have been or have worked with drug-smugglers, and contact with confidential informants who deal on an ongoing basis with narcotics-smuggling organizations and their tactics. He will testify that marijuana generally doubles in value when it crosses the United States-Mexico border.

From this testimony, the Government should be allowed to argue that the value of the marijuana circumstantially shows that the defendant knew the car he occupied contained marijuana, and that he possessed it with the intent to distribute. A reasonable inference from possession of this value of drugs is that the original owners would not entrust such a valuable commodity to a complete stranger who has no idea he is carrying the drugs. Also, the more valuable drugs are, the more reasonable it is to infer that they were meant to be further distributed to maximize sales. As knowledge and intent are essential elements of the offenses charged, the desired expert testimony is highly probative.

The Ninth Circuit has long allowed the introduction of such expert testimony, and has long permitted counsel to argue reasonable inferences therefrom. See, e.g., United States v. Ogbuehi, 18 F.3d 807 (9th Cir. 1994). In Ogbuehi, the defendant was charged with importing about 2.5 pounds of heroin. At trial, the Government introduced expert testimony of a DEA special agent as to the estimated street retail value of the heroin. The Ninth Circuit found that such testimony was proper, and that its probative value was not substantially outweighed by any prejudicial effect. Id. at 812 ("DEA agents can testify as to the street value of narcotics, . . . and counsel can argue reasonable inferences from it") (citation omitted); see also United States v. Savinovich, 845 F.2d 834, 838 (9th Cir. 1988) (evidence of $100,000 street value of cocaine was relevant to proving the defendant's intent to distribute); United States v. Ramirez-Rodriguez, 552 F.2d 883, 885 (9th Cir. 1977) (evidence of resale value of drug probative of intent to distribute); United States v. Golden, 532 F.2d 1244, 1247 (9th Cir.1976) ("The value of the heroin found in the bags was relevant to both appellants' knowledge of the presence of the heroin and

7

intent to distribute") (citations omitted); <u>Gaylor v. United States</u>, 426 F.2d 233, 235 (9th Cir. 1970) (in prosecution for transporting cocaine, testimony concerning the selling price of cocaine was relevant to issue of knowledge, since it tended to refute "the possibility that a stranger could have placed such a valuable cargo in a vehicle in the hope that the vehicle could be followed and the cocaine later recovered in the United States").

### 3.  **Personal Use versus Distributable Amount**

Finally, the Government intends to elicit expert testimony from an agent to establish that the quantity of marijuana found in the vehicle occupied by defendant is a distributable, rather than personal use amount. <u>See</u> <u>United States v. Tavakkoly</u>, 238 F.3d 1062, 1067 (9th Cir. 2001) (undisputed expert testimony that 1.35 kg of opium was inconsistent with possession for personal use was relevant to prove defendant's intent to distribute); <u>United States v. Alatorre</u>, 222 F.3d 1098, 1104-05 (9th Cir. 2000) (expert testimony properly admitted to establish that quantity of marijuana was distributable amount, rather than just personal use amount).

### B.  **Prohibit Self-Serving Hearsay**

The Defendant must be precluded from introducing his own statements through the testimony of another witness, the opening statement of counsel, or argument by counsel. Any such attempt would be impermissible because those statements are hearsay. While the Government may use the statements of a defendant against him under Federal Rule of Evidence 801(d)(2) (admission by party-opponent), this Rule may not be relied upon by the Defendant because he is not the proponent of the evidence and the evidence is not being offered against him (but rather on his behalf). Defendant cannot attempt to have "self-serving hearsay" brought before the jury without the benefit of cross-examination by the United States. <u>See e.g.</u>, <u>United States v. Fernandez</u>, 839 F.2d 639, 640 (9th Cir. 1987).

Nor can Defendant rely on Rule 801(d)(1)(B), which provides that a statement is not hearsay if:

> The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

A prior consistent statement is not admissible if it is introduced in the absence of impeachment. <u>See</u> <u>United States v. Navarro-Varelas</u>, 541 F.2d 1331, 1334 (9th Cir. 1976) (appellant offered to introduce and play tape recording of interview of appellant and DEA agent to reinforce appellant's

8

credibility). Moreover, even if the declarant's testimony has been impeached, prior consistent statements are not admissible if the declarant had motive to give false information at the time that the prior out-of-court statement was made. See United States v. DeCoito, 764 F.2d 690, 694 (9th Cir. 1985) (declarant's prior consistent statement not admissible for purposes of rehabilitation if declarant had motive to lie to avoid prosecution when prior statement was made); United States v. Rohrer, 708 F.2d 429, 433 (9th Cir. 1983) (diagram drawn by declarant not admissible as prior consistent statement because declarant had motive when diagram was made to fabricate, that is, driving better leniency bargain with the government).

Finally, Defendant cannot rely on Rule 803(3), which provides that the hearsay rule does not exclude then existing mental, emotional, or physical condition. See Fed.R.Evid. 803(3). Addressing this issue in the context of a "derivative entrapment" defense, the Ninth Circuit affirmed the trial court's exclusion of testimony by a witness that the defendant had told the witness that the defendant was afraid of government agents. The court relied on the language emphasized above in Rule 803(3), holding that the rule did not except the witness's testimony from the hearsay rule. See United States v. Emmert, 829 F.2d 805, 809-10 (9th Cir. 1987).

Defendant cannot introduce his own statements through the testimony of another witness or by improper reference during opening statements. Defendant is free to provide a statement from the witness stand where he would properly be subject to searching cross-examination.

### C. The Court Should Prohibit Reference to Defendant's Health, Finances, Education, and Potential Punishment

Evidence of, and thus argument referring to, a defendant's health, finances, education, and potential punishment is inadmissible and improper.

As noted above, Federal Rule of Evidence 402 provides that "[e]vidence which is not relevant is not admissible." Moreover, Rule 403 provides further that even relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." The Ninth Circuit Model Jury Instructions explicitly instruct jurors to "not be influenced by any personal

9

likes or dislikes, opinions, prejudices, or sympathy." § 3.1 (2003 Edition).[1/] Reference to the Defendant's health, age, finances, education, and potential punishment may be relevant at sentencing. However, at trial, such references are not only irrelevant and unfairly prejudicial, but a blatant play for sympathy and jury nullification as well.

### D. Demeanor Evidence Should Be Admitted

Evidence regarding a defendant's demeanor and physical appearance is admissible as circumstantial evidence that is helpful to the jury's determination as to whether a defendant knew drugs were concealed in the vehicle. Fed.R.Evid. 701; United States v. Hursh, 217 F.3d 761 (9th Cir. 2000) (holding that a jury may consider a defendant's nervousness during questioning at Calexico port of entry); United States v. Fuentes-Cariaga, 209 F.3d 1140, 1144 (9th Cir. 2000) (holding that it is within the ordinary province of jurors to draw inferences from an undisputed fact such as a defendant's nervousness at Calexico port of entry); United States v. Barbosa, 906 F.2d 1366, 1368 (9th Cir. 1990) (holding that a jury could infer guilty knowledge from a defendant's apparent nervousness and anxiety during airport inspection); Unites States v. Lui, 941 F.2d 844, 848 n.2 (9th Cir. 1991) (holding that a jury could consider guilty knowledge from a defendant's acting disinterested during airport inspection).

Here, witnesses for the United States may properly testify to Defendant's demeanor and physical appearance, as they have personal knowledge based upon their observations of Defendant.

### E. The Court Should Limit Character Evidence

The United States anticipates that Defendant may improperly attempt to introduce testimony regarding Defendant's specific acts of prior good conduct. Testimony as to multiple instances of good conduct violates Federal Rule of Evidence 405(a). United States v. Barry, 814 F.2d 1400, 1403 (9th Cir. 1987); Government of Virgin Islands v. Grant, 775 F.2d 508, 512 (3d Cir. 1985). Federal Rule of Evidence 404(a)(1) further states that evidence of a person's character is not admissible for the purpose of proving a person's actions on a particular occasion except "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same. . . ."

---

[1/] Additionally, it is inappropriate for a jury to be informed of the consequences of their verdict. See United States v. Frank, 956 F.2d 872, 879 (9th Cir. 1991).

10

A character witness can not offer specific instances of conduct by the defendant which would tend to support the reputation of the defendant. United States v. Hedgecorth, 873 F.2d 1307, 1313 (9th Cir. 1989) ("[W]hile a defendant may show a characteristic for lawfulness through opinion or reputation testimony, evidence of specific acts is generally inadmissible"). In interpreting the permissible scope of character evidence under Rule 404(a), the Ninth Circuit Court of Appeals has ruled that presentation of witnesses to testify about a defendant's character for "law abidingness" and honesty is permissible. The appellate court, however, has held that asking a defense witness about the defendant's propensity to engage in a specific type of criminal activity is not allowed under Rule 404(a). See United States v. Diaz, 961 F.2d 1417 (9th Cir. 1992) (holding that it is impermissible to ask a character witness about the defendant's propensity to engage in large scale drug dealing).

Thus, Defendant should be prohibited from introducing testimony from any character witness about (a) a specific instance of Defendant's conduct, and (b) Defendant's propensity to be involved in drug smuggling.

### F. The Court Should Exclude Witnesses During Trial With The Exception of the United States' Case Agent

Under Federal Rule of Evidence 615(3), "a person whose presence is shown by a party to be essential to the presentation of the party's cause" should not be ordered excluded from the court during trial. The case agent in the present matter has been critical in moving the investigation forward to this point and is considered by the United States to be an integral part of the trial team. As such, the case agent's presence at trial is necessary to the United States. However, the United States requests that Defendant's testifying witnesses be excluded during trial pursuant to Rule 615.

### G. The Court Should Preclude Evidence of Duress and Necessity

Courts have specifically approved the pretrial exclusion of evidence relating to a legally insufficient duress defense on numerous occasions. See United States v. Bailey, 444 U.S. 394 (1980) (addressing duress); United States v. Moreno, 102 F.3d 994, 997 (9th Cir. 1996), cert. denied, 522 U.S. 826 (1997) (addressing duress). Similarly, a district court may preclude a necessity defense where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." United States v. Schoon, 971 F.2d 193, 195 (9th Cir. 1992).

In order to rely on a defense of duress, Defendant must establish a prima facie case that:

1    (1)    Defendant committed the crime charged because of an immediate threat of death or
2           serious bodily harm;
3    (2)    Defendant had a well-grounded fear that the threat would be carried out; and
4    (3)    There was no reasonable opportunity to escape the threatened harm.

United States v. Bailey, 444 U.S. 394, 410-11 (1980); Moreno, 102 F.3d at 997.  If Defendant fails to make a threshold showing as to each and every element of the defense, defense counsel should not burden the jury with comments relating to such a defense.  See, e.g., Bailey, 444 U.S. at 416.

A defendant must establish the existence of four elements to be entitled to a necessity defense:

(1)    that he was faced with a choice of evils and chose the lesser evil;
(2)    that he acted to prevent imminent harm;
(3)    that he reasonably anticipated a causal relationship between his conduct and the harm to be avoided; and
(4)    that there was no other legal alternatives to violating the law.

See Schoon, 971 F.2d at 195; United States v. Dorrell, 758 F.2d 427, 430-31 (9th Cir. 1985).  A court may preclude invocation of the defense if "proof is deficient with regard to any of the four elements."  See Schoon, 971 F.2d at 195.

The United States hereby moves for an evidentiary ruling precluding defense counsel from making any comments during the opening statement or the case-in-chief that relate to any purported defense of "duress" or "coercion" or "necessity" unless Defendant makes a prima facie showing satisfying each and every element of the defense.  The United States respectfully requests that the Court rule on this issue prior to opening statements to avoid the prejudice, confusion, and invitation for jury nullification that would result from such comments.

**H.    The Court Should Preclude Any Expert Testimony by Defense Witnesses**

The United States has made a request from the Defendant for reciprocal discovery.  It is permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of Defendant, which Defendant intends to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Moreover, Defendant must disclose written summaries of testimony that Defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial. The summaries are to describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications. While defense counsel may wish to call an expert to testify, Defendant has provided neither notice of any expert witness, nor any reports by expert witnesses. Accordingly, Defendant should not be permitted to introduce any expert testimony if he fails to disclose such information by the expert discovery cut off date set by the Court.

If the Court determines that Defendant may introduce expert testimony, the United States requests a hearing to determine this expert's qualifications and relevance of the expert's testimony pursuant to Federal Rule of Evidence 702 and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). See United States v. Rincon, 11 F.3d 922 (9th Cir. 1993) (affirming the district court's decision to not admit the defendant's proffered expert testimony because there had been no showing that the proposed testimony related to an area that was recognized as a science or that the proposed testimony would assist the jury in understanding the case); see also United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir.), cert. denied, 530 U.S. 1268 (2000).

### I.   United States' Renewed Motion for Reciprocal Discovery

As of the date of the preparation of these motions, Defendant has produced no reciprocal discovery. The United States requests that Defendant comply with Rule 16(b) of the Federal Rules of Criminal Procedure, as well as Rule 26.2 which requires the production of prior statements of all witnesses, except for those of Defendant. Defendant has not provided the United States with any documents or statements. Accordingly, the United States will object at trial and ask this Court to suppress any evidence at trial which has not been provided to the United States.

### J.   Blind Mule Testimony Should Be Admitted in Rebuttal if Defendant Opens the Door

The Government requests to admit testimony concerning "blind mules" and "unknowing drug couriers" should the defendant present a defense that "opens the door" to such testimony. United States v. Murillo, 255 F.3d 1169 (9th Cir. 2001) overruled on other grounds, United States v. Mendez, 476 F.3d 1077 (9th Cir. 2007); United States v. Beltran-Rios, 878 F.2d 1208 (9th Cir. 1989).

13

## IV

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that its motions in limine be granted.

DATED:     August 19, 2008.

                                                      Respectfully submitted,

                                                      KAREN P. HEWITT
United States Attorney

s/ Alessandra P. Serano

ALESSANDRA P. SERANO
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 08CR0803-H |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CERTIFICATE OF SERVICE |
| RAUL GUTIERREZ-VILLALOBOS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED THAT:

    I, ALESSANDRA P. SERANO, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

    I am not a party to the above-entitled action. I have caused service of Government's Motions in Limine, on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

    Antonio Yoon, Esq.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on August 19, 2008

                                          s/Alessandra P. Serano
                                          ALESSANDRA P. SERANO